IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

SHERRY RENEE PARKS                                                    PLAINTIFF

      VS.                         Civil No. 2:14-cv-02089-TLB-MEF

CAROLYN W. COLVIN,
Commissioner of Social Security Administration                       DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

      Plaintiff, Sherry Renee Parks, brings this action under 42 U.S.C. §405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying her claim for a period of disability and disability insurance benefits ("DIB"), and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. 42 U.S.C. § 405(g).

**I.  Procedural Background:**

      Plaintiff filed her applications for DIB and SSI on October 3, 2011, alleging an onset of disability on April 2, 2011. (T. 139-147, 148-149, 150-157) She alleged disability due to leg pain, left foot pain, left shoulder pain, right shoulder pain, neck - bulging discs, back pain, COPD, depression, and knee pain. (T. 195)  Her applications were denied initially and on reconsideration. (T. 74-76, 77-80, 81-83, 87-88) Plaintiff requested an administrative hearing, and the hearing was held on February 13, 2013, before the Hon. Eliaser Chaparro, Administrative Law Judge (ALJ). (T. 89-90, 26-63) Plaintiff was present and represented by her attorney, Susan E. Brockett. (T. 26, 28)

-1-

Plaintiff was 51 years old at the time of the hearing. (T. 29) She completed high school and had a high school diploma. (T. 29) She worked at a grocery store from March, 1995 until September 1, 2004, and then at Walmart from September 7, 2004 until April 2, 2011. (T. 186) She worked as a supervisor over several different departments at Walmart. (T. 31) Plaintiff stopped working on April 2, 2011 because, she testified, she accidentally took some of her husband's medication instead of her own, was drug tested, and lost her job. (T. 32-33)

In a Decision issued on April 12, 2013, the ALJ found that Plaintiff had not engaged in substantial gainful activity since April 2, 2011, the alleged onset date, and that although Plaintiff has the following severe impairments, cervical degenerative disc disease, fibromyalgia, left shoulder pain status post-surgery, osteoarthritis, and depressive disorder (20 C.F.R. §§ 404.1520(c) and 416.920(c)), Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 404.920(d), 416.925 and 416.926). (T. 11-14)

The ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), subject to the following limitations: she can lift and carry no more than 20 pounds at one time and no more than 10 pounds frequently; she can perform activities that require a good deal of walking or standing, as much as six hours in an eight-hour workday; she can do no frequent bending, crouching or climbing, and she cannot engage in frequent overhead reaching; she cannot be exposed to concentrated amounts of respiratory irritants such as dusts, fumes, odors, gases or any changes in temperature and humidity; she is restricted to unskilled work; she must work in an environment where interpersonal contact is incidental to the work performed, the complexity of tasks is learned and performed by rote, requires

little independent judgment and the supervision required is simple, direct, and concrete. (T. 14-18) With the assistance of a vocational expert, Dianne G. Smith, the ALJ determined that while Plaintiff could not return to any of her past relevant work (T. 59), Plaintiff could perform the requirements of representative light, unskilled jobs such as an assembly machine tender (DOT#754.685-010), of which there are 2,500 jobs in Arkansas, 15,000 regionally and 375,000 in the national economy, and as a small products assembler (DOT#706.684-022), of which there are 14,000 jobs in the Arkansas economy, 130,000 regionally and 1.5 million in the national economy. (T. 19-20, 59) The ALJ then concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, since the date of her alleged onset on April 2, 2011. (T. 20)

Plaintiff requested review of the ALJ's decision by the Appeals Council (T. 4). The request for review was denied on February 11, 2014, and the ALJ's decision became the Commissioner's final decision for judicial review. (T. 1-3) *See* 42 U.S.C. § 405(g). Plaintiff filed this action on April14, 2014. (Doc. 1) Both parties have filed appeal briefs (Doc. 9 and 10), and the case is before the undersigned for report and recommendation.

## II.  Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is more that a scintilla, but less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). The ALJ's

decision must be affirmed if the record contains substantial evidence to support it. *Perales*, 402 U.S. at 390; *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a medically determinable physical or mental impairment that has lasted at least one year and that prevents her from engaging in substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3) and 1382(3)(c). A claimant must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

The Commissioner's regulations require application of a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his or her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past

relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his or her age, education, and experience. 20 C.F.R. §§ 404.1520(a)-(f)(2012).  Only if the final stage is reached does the fact finder consider the claimant's age, education, and work experience in light of his or her residual functional capacity. *McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520 and 416.920 (2012).

### III.  Discussion:

The Court must determine whether substantial evidence, taking the record as a whole, supports the Commissioner's decision that Plaintiff was not disabled since the alleged onset date of April 2, 2011. Plaintiff raises three issues on appeal: (A) the ALJ failed to fully develop the record; (B) the ALJ erred as to credibility; and, (C) the ALJ erred as to RFC. (Doc. 9, pp. 11-19) Each issue is addressed in turn.

### A.  ALJ Failed To Fully Develop The Record

Plaintiff argues that if the ALJ thought the Plaintiff's true work related restrictions were not evident from the record, she believes the ALJ should have sought further clarification regarding the severity of her impairments. (Doc. 9, p. 11) She suggests that if the ALJ had any questions as to what the treating physician (Dr. Birk) opined or why he opined it, the ALJ could have contacted Dr. Birk, or had Plaintiff's attorney contact him, for further interrogatories. (Doc. 9, p. 11) She contends that she has severe symptoms relating to her shoulder impairments, and "these should have been further explored as it would have resulted in a substantially more restrictive RFC." (Doc. 9, p. 13)

The ALJ has a duty to fully and fairly develop the record. *Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995)(ALJ must fully and fairly develop the record so that a just determination of disability may be made). This duty exists "even if ... the claimant is represented by counsel." *Boyd v. Sullivan*,

960 F.2d 733, 736 (8th Cir.1992), quoting *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir.1983).  The ALJ, however, is not required to act as Plaintiff's counsel. *Clark v. Shalala*, 28 F.3d 828, 830 (8th Cir. 1994) (ALJ not required to function as claimant's substitute counsel, but only to develop a "reasonably complete" record); *Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995) (reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial). There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis. *Battles v. Shalala*, 36 F.3d 43, 45 (8th Cir. 1994).

The need for medical evidence does not necessarily require the Commissioner to produce additional evidence not already within the record. An ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision. *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001). Providing specific medical evidence to support her disability claim is, of course, the Plaintiff's responsibility, and that burden of proof remains on her at all times to prove up her disability and present the strongest case possible. *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991); 20 C.F.R. §§ 404.1512(a) and (c), 416.912(a) and (c).

Considering the evidence as a whole in the present case, the undersigned concludes that the ALJ was not required to further develop the record because it was already "reasonably complete," and it contained sufficient evidence from which the ALJ could make an informed decision.

At the beginning of the administrative hearing, the ALJ inquired whether Plaintiff's counsel had any objections to admission of the exhibits in the file. Counsel made no objections to any of the exhibits. (T. 28) Plaintiff's counsel did not request that the ALJ obtain any further evidence, nor did

she identify any additional medical records that she wished to submit subsequent to the hearing. (T. 28) It is significant to the undersigned that Plaintiff's counsel made no mention of the need for any additional medical records or examinations beyond those which were included in the record. See *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993)("it is of some relevance to us that the lawyer did not obtain (or, so far as we know, try to obtain) the items that are now being complained about").

Plaintiff now argues, however, that the ALJ was obliged to obtain further information "if he had questions" about her treating physician's medical source statement as it related to her RFC. It is the ALJ's role to determine RFC, and although medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner. See 20 C.F.R. § 404.1527(e)(2); *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005). Medical records relating to all of Plaintiff's alleged physical and mental conditions were considered by the ALJ, including treatment records, consultative examinations and state agency doctors' opinions, and there was ample medical evidence from which the ALJ could make an informed decision regarding Plaintiff's RFC.

The ALJ specifically addressed Dr. Birk's medical source statement dated July 16, 2012 in making his RFC determination. He considered that Dr. Birk opined that Plaintiff could sit, stand or walk five to eight hours in a day; that she could occasionally squat, crawl, climb, reach above the head and kneel; that she could frequently bend, stoop or crouch; that she could frequently look down, look up and hold her head in a static position, and could occasionally turn her head to the left and right; and, that she could tolerate frequent exposure to unprotected heights and occasional exposure to moving machinery, temperature changes, dust, fumes, gases and noise. The ALJ also noted that Dr. Birk opined that Plaintiff would need the option to sit, stand or walk at will, would sometimes need unscheduled breaks and, on average, be absent from work because of her impairments about

two days per month. The ALJ did not express having "any questions" about Dr. Birk's opinions, nor indicate any need for further clarification, and the ALJ gave Dr. Birk's opinion some weight as it was generally consistent with the medical evidence of record. The ALJ did find some of Dr. Birk's opinions, such as the sit, stand or walk at will option, unsupported by the objective findings in the record. (T. 18) There is substantial evidence in the record to support the ALJ's conclusion.

Treatment records before the relevant period show that Plaintiff had surgery on her left shoulder in 2008, and that on January 8, 2009 there was a question of whether she had re-injured herself. (T. 372-373) During her next office visit, it was charted that she had not gotten the MRI as instructed at her last visit, and that she had "fairly normal function in the shoulder today." (T. 371) The MRI was eventually done and showed no new tear, and on March 23, 2009 it was felt that Plaintiff was just "over-doing it." (T. 370) Plaintiff continued to see Dr. Birk for follow-up visits for her left shoulder throughout 2009. On December 10, 2009, Dr. Birk noted that they had been discussing an open procedure "for well over a year now," and that while Plaintiff continued to complain about it, she also continued to "miss a lot of follow ups and has cancelled her surgery 2 or 3 times." (T. 367) At that point, Plaintiff elected to proceed with an open distal clavicle excision which was scheduled on December 29, 2009. (T. 367)

Following the open distal clavicle procedure, Plaintiff responded quite well and without any significant complaints or problems. (T. 366) Six weeks out from the surgery, Dr. Birk noted that Plaintiff "overall is doing well," and that her motion was good. (T. 364) At her appointment on March 29, 2010, Plaintiff still complained of pain in her shoulder, but upon physical examination it was found that "she is moving her shoulder through a normal range of motion," and that "at least clinically she is doing quite a bit better." (T. 363) At her next visit on May 17, 2010, Plaintiff

-8-

reported that she continued to have pain in the shoulder, and it was noted that "this seems to be a chronic issue. . .[w]e have tried multiple treatments without resolution of her problems." Her physical exam revealed that while she was tight with cross body abduction, the rest of her range of motion was "actually quite normal," she had no weakness to suggest anything was wrong with her rotator cuff, her motor strength was 5/5, and no neurological changes were observed. "A little bit" of narcotic pain medication was prescribed. (T. 326) Three months later, on August 23, 2010, a trend was noted that when Plaintiff does not work "she really has very little to no pain in the shoulder," and it was discussed "what she could get away with pain medicine wise" at work, and Plaintiff thought three per day. (T. 325)

Plaintiff saw Clay Ellison, PA-C, on September 15, 2010, and she reported suffering a left shoulder strain from moving boxes at work. A shoulder sling was given, and Naprosyn and Lortab were prescribed. (T. 276) Eight days later, she continued to complain of shoulder pain, and she was told to apply moist heat and another prescription for Lortab was given. (T. 275) On October 6, 2010, she again presented to PA Ellison, indicating that she "needs release to go back to work tomorrow." She was again told to use moist heat, continue taking Naprosyn, physical therapy for four weeks was recommended, and she was restricted from lifting greater than five pounds for two weeks. (T. 274)

During her next visit with Dr. Birk on October 14, 2010, Plaintiff reported having a work injury to her left shoulder at work that occurred on September 15, 2010. It was confirmed that Plaintiff had not suffered a separated shoulder, and some physical therapy "to get her scapula gliding again" was recommended. (T. 323-324) She was noted to be doing "a little bit better" on December 6, 2010, and the trend of "when she works she has some more pain in this shoulder and when she does not work it seems not to bother her" was documented again. Another prescription for narcotic

pain medication was given, to be taken occasionally, and the doctor noted that "I have also told her though that we really probably need to cut down on that." (T. 322)

X-rays taken on February 14, 2011 showed some degenerative changes at C5-6, and the doctor mused that he did not think Plaintiff's pain was coming from her shoulder, but "I think it is coming from her neck," and cervical physical therapy was recommended. (T. 321) When Plaintiff returned on March 28, 2011, she had not done any of the recommended cervical physical therapy[1], and she reported to her doctor that she had been in the hospital "with a case of pneumonia." (T. 320) In truth, Plaintiff had been in the hospital for an overdose of a combination of prescription drugs, and the pneumonia was likely secondary to aspirating her own vomit. (T. 287) A psychiatric consult while Plaintiff was in the hospital resulted in a diagnosis of "prescription drug abuse/over use, probable depression," and a referral to drug treatment was recommended. (T. 288-289) Plaintiff declined the referral to drug treatment. (T. 290) On the date of her discharge from the hospital, March 24, 2011, Plaintiff also saw PA Ellison, and it was charted that Plaintiff had taken a drug overdose (45 Valium), and his assessment was drug overdose, drug addiction, and his treatment plan was a referral to drug rehab. (T. 269) Just ten days before, Plaintiff told PA Ellison that her husband had stolen her meds (Valium), and she was given refills of her Valium and hydrocodone. (T. 270) Despite these medical records evidencing a diagnosis of prescription drug abuse and/or addiction, and acknowledging a problem with opiates, Plaintiff denied in her hearing testimony that the hospital had told her she may need a referral to drug treatment. (T. 37, 41)

_____

[1] In general, the failure to obtain follow-up treatment indicates that a person's condition may not be disabling or may not be as serious as alleged. *See Shannon v. Chater*, 54 F.3d 484, 487 (8th Cir. 1995) (holding "[g]iven his alleged pain, Shannon's failure to seek medical treatment may be inconsistent with a finding of disability").

Following her surgery on December 29, 2009, Plaintiff was off work for eight weeks, and upon her return to work she was moved to a supervisor position that did not involve any lifting. (T. 32) She last worked on April 1, 2011. Her departure from her supervisor's job at Walmart had nothing to do with any physical or mental impairment, but because she "accidentally took my husband's medication one day." She was drug tested, failed the test, and was terminated. (T. 32-33)

During the relevant period after April 2, 2011, Plaintiff returned to see Dr. Birk again on April 18, 2011, at which time the doctor opined that, "I am pretty sure she has a bulge in neck or herniation," but he notes that she has not gotten the MRI he recommended. (T. 319) A couple of months later on June 13, 2011, Dr. Birk documented that Plaintiff was only "mildly tender" in the paraspinal muscles of her neck with no spasms. She was again urged to do some physical therapy and instructed to return in three months. (T. 318) When she returned on September 19, 2011, she subjectively described her neck pain as 10 out of 10, with a duration of six months, continuous since onset, and that alleviating factors are pain meds. (T. 315) She described her shoulder pain as "aching, burning, sharp, deep, occasional," but the severity is charted as "no pain," and while she stated it was "continuous since onset," but she could not identify any timing or context of the pain. She again listed pain meds as an alleviating factor. (T. 316) On examination, no muscle atrophy was observed in her cervical spine, and while some tenderness was seen, there were no spasms, and her active and passive cervical ranges of motion were documented to be normal. (T. 316)

After submitting her applications for DIB and SSI benefits on October 3, 2011, Plaintiff next saw Dr. Birk again on December 15, 2011. At that time she now complained being in constant pain in both shoulders, her neck, that the pain travels down her back, and that her symptoms are getting worse. (T. 347) Plaintiff had not previously complained of symptoms in her right shoulder, nor had

-11-

she previously reported any radicular symptoms. She stated that previous physical therapy "helped a little" and she was still attending, that previous injections "did not help," and that medications were "helping a lot." (T. 348) Her physical exam showed that she was tender in her neck, but no spasms were seen, and there were no significant neurological changes; her right shoulder was tender - specifically at the AC joint and with cross body abduction, but no weakness was noted with rotator cuff testing; and, her left shoulder was noted to be only mildly tender at the AC joint, with no rotator cuff weakness. Prescriptions for Zanaflex (a muscle relaxer) and hydrocodone (for pain) were given. (T. 349) Plaintiff next saw Dr. Birk three months later, on March 15, 2012, for a follow up on her bilateral shoulder and neck pain. She advised that her previous physical therapy "helped temporarily," that medications were "helping a little," and that there was no change in her symptoms. (T. 394) Her physical exam showed that her cervical spine had proper alignment and no muscle atrophy; that she was tender in her neck; and, she was noted to have some limitation in her cervical range of motion. It was also noted that Plaintiff had bilateral shoulder pain, but no weakness was seen with rotator cuff testing. A prescription for hydrocodone was given. (T. 394) Plaintiff did not seen Dr. Birk again before the issuance of his medical source statement four months later on July 16, 2012.

Plaintiff saw James W. Logan, M.D. for an assessment of arthralgia. On November 30, 2012 Dr. Logan documented that Plaintiff has "no clinical evidence of autoimmune disease or other rheumatic disease," that she has physical findings of generalized osteoarthritis and some soft tissue tender points consistent with fibromyalgia, but "these are not inflammatory conditions and I do not have any specific treatment for these." Dr. Logan suggested some modification of her anti-inflammatory regimen, and he deferred the handling her narcotic pain management. Dr. Logan

further indicated that "if she does not have evidence of inflammatory arthropathy with my workup, I will leave long-term followup to her referring physician." (T. 430) Lab work was ordered by Dr. Logan, and Plaintiff returned to see him on January 2, 2013. Once again, Plaintiff had no warmth or swelling of her joints, and her lab work did not indicate any inflammatory arthropathy or rheumatic disease. (T. 426-427) Samples of Cymbalta were given, and Plaintiff was referred to pain management for "workup of her issues with chronic neck and back pain." (T. 426-427)

Upon such evidence as a whole, the ALJ could adequately weigh Dr. Birk's medical source statement of July 16, 2012 without obtaining further medical source information. *See Halverson v. Astrue*, 600 F.3d 922, 929-30 (8th Cir. 2010)(explaining that "[w]hen a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight" (internal quotation marks and citation omitted)); *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)(holding that the ALJ properly discounted the treating physician's opinion that consisted of three checklist forms, cited no medical evidence, and provided little to no elaboration); *Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005)(recognizing that "[w]e have upheld an ALJ's decision to discount a treating physician's [medical source statement] where the limitations listed on the form stand alone, and were never mentioned in [the physician's] numerous records o[f] treatment nor supported by any objective testing or reasoning" (first and second alterations added) (internal quotation marks and citation omitted)).

The evidence of record contains voluminous reports detailing the evaluations and treatment of both Plaintiff's physical and mental impairments. The undersigned does not believe that these medical and mental health records leave some crucial issue undeveloped or under-developed. The evidence fully and completely documents Plaintiff's physical and mental impairments before and

-13-

during the relevant period, and it provides a sufficient basis for the ALJ's decision. The ALJ was not, therefore, obligated to obtain even more medical evidence to develop the record further. If Plaintiff wanted to present more specific information in addition to the medical evidence of record, she had the opportunity and should have done so. *Onstad*, 999 F.2d at 1234. Reversal for failure to fully and fairly develop the record is warranted only where such failure is unfair or prejudicial. *Haley*, 258 F.3d at 748. Plaintiff has not shown that the ALJ failed to develop the record in an unfair or prejudicial manner. Plaintiff's argument on this point must be rejected.

### B.  ALJ Erred As To Credibility

Plaintiff next asserts that the ALJ failed to perform a proper credibility analysis. (Doc. 9, pp. 13-15) Plaintiff contends that her subjective complaints of pain were summarily dismissed by the ALJ without a proper discussion of why they were not considered entirely credible.

Contrary to Plaintiff's assertion, the ALJ's Decision shows that he did conduct a proper analysis of Plaintiff's credibility under *Polaski v. Heckler*, 739 F.2d 1320, 1321-22, 751 F.2d 943, 948 (8th Cir. 1984), and related Social Security Regulations and Rulings. In making his finding regarding Plaintiff's RFC, the ALJ first stated that he "has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p." (T. 14) The ALJ further advised that in considering Plaintiff's subjective allegations, he gave "careful consideration to all avenues presented that relate to such matters as: (1) the nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) precipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3) type, dosage, effectiveness, and adverse side-effects of any pain medications; (4) treatment, other than medication,

for relief of pain; (5) functional restrictions; and, (6) the claimant's daily activities." (T. 14) The ALJ also stated that consideration was given to all of the evidence presented related to Plaintiff's prior work history, and the observations of non-medical third parties, as well as treating and examining physicians, citing 20 CFR §§ 404.1529 and 419.929 and *Polaski*.

The ALJ commented that despite her alleged limitations, the Plaintiff reported that she can provide for her own personal care, her son[2] and two dogs. The ALJ noted that Plaintiff reported that she can cook, do laundry, clean, work in the flower beds, walk, drive a car, go out alone and shop for groceries and household needs. Plaintiff also reported going to her son's football games once a week during the season, having people over every six months and talking on the phone daily. (T. 15; referring to Exhibit 6E, T. 207-214) Clearly, the ALJ considered and addressed Plaintiff's activities of daily living, finding them to be inconsistent with her allegations and testimony of disabling pain. *See Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007)(claimant's activities of daily living such as an ability to drive close to home, doing some laundry, cooking, and gaining custody of two grand-daughters, were consistent with a finding of light RFC).

The ALJ then discussed the medical evidence, giving specific reasons for concluding that the objective findings in this case fail to support Plaintiff's allegations of disabling symptoms and limitations. (T. 16-17) Much of that medical evidence relating to Plaintiff's physical impairments is discussed above in the preceding section.

The ALJ also commented on the medical evidence relating to Plaintiff's mental impairment. He specifically mentioned the report of the consultative examiner, Dr. Nelson, who diagnosed

---

[2] Her nephew, actually, but a ten-year old child that she has legal custody of. (T. 42-43)

-15-

Plaintiff as being only "mildly depressed," and who was assessed with a GAF of 61-70[3]. The ALJ pointed out that Plaintiff had not received any psychiatric treatment or medication for depression, and he found the evidence insufficient to support the limitations opined by Dr. Nelson[4]. The undersigned would also point out that Dr. Nelson's report contains inaccuracies in the history given by Plaintiff, e.g., "she hasn't worked since the injury in 2010" and "no substance abuse," and that Dr. Nelson documented that "she didn't exhibit any pain." (T. 339-340)

The ALJ also considered the dosage, effectiveness, and adverse side-effects of Plaintiff's pain medication when evaluating her credibility. (T. 16-17) The ALJ specifically discussed that Plaintiff's most recent course of treatment included anti-inflammatory medications prescribed by Dr. Logan on November 30, 2012 and January 2, 2013, and that Dr. Birk had recommended treatment with physical therapy and medication. The ALJ properly considered that Plaintiff's on-going physical impairments were being treated conservatively. *See Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993)(treating physician's conservative treatment was inconsistent with plaintiff's allegations of disabling pain). Plaintiff argues that the ALJ did not mention adverse side effects of her pain medication (Doc. 9, pp. 14-15), but the medical evidence of record fails to show that Plaintiff ever complained of adverse medication side-effects to her physicians. *See Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994)(claimant never discussed side effects of his medication with his doctor or asked for modification of the medication). To the contrary, Plaintiff generally reported that her

---

[3] A GAF of 61-70 indicates "[s]ome mild symptoms, OR some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at p. 34.

[4] All of the limitations expressed by Dr. Nelson, a psychologist, are related to alleged physical conditions and not mental impairments. (T. 341)

pain medication alleviated her pain and helped "a lot." (T. 315, 316, 348) The medical evidence shows some narcotic drug seeking behavior by Plaintiff - a woman who admittedly has a problem with prescription pain medication. (T. 38-41, 269, 270, 285-290) A claimant's misuse of medications is a valid factor in an ALJ's credibility determination. *See Anderson v. Shalala*, 51 F.3d 777, 780 (8th Cir. 1995) (observing that claimant's "drug-seeking behavior further discredits her allegations of disabling pain"); and, *Anderson v. Barnhart* 344 F.3d 809, 815 (8th Cir. 2003)(claimant's credibility discounted due to possible overuse of narcotic pain medications).

The question, ultimately, is not whether the evidence supports the existence of an impairment, but whether the evidence of record as a whole can support a claimant's allegations of disabling symptoms. *Benskin v. Bowen*, 830 F.2d 878 (8th Cir. 1987). If there are inconsistencies in the evidence of record as a whole, the ALJ is free to disbelieve a claimant's subjective complaints and find them not credible. *Cruse v. Bowen*, 867 F.2d 1183, 1186 (8th Cir. 1989).

The Eighth Circuit has held that, "[t]he ALJ is in the best position to gauge the credibility of testimony and is granted great deference in that regard." *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). If the ALJ discredits a claimant's credibility and gives good reason for doing so, the Eighth Circuit has held that it will defer to the ALJ's judgment even if the ALJ does not cite to *Polaski* or discuss every factor in depth. *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007).

In the present case, the ALJ has complied with the Eighth Circuit's preferred practice and has cited to *Polaski*, as well as to Social Security Regulations and Rulings that mirror the *Polaski* factors and expand upon them. In sum, it is clear to the undersigned that the ALJ applied the proper legal standard to the determination of whether Plaintiff's allegations and testimony were credible, and there is substantial evidence of record to support the ALJ's decision to discount Plaintiff's

-17-

credibility.

## B.  ALJ Erred As To RFC

The ALJ determined that Plaintiff has the RFC to perform light work, subject to the following limitations: she can lift and carry no more than 20 pounds at one time and no more than 10 pounds frequently; she can perform activities that require a good deal of walking or standing, as much as six hours in an eight-hour workday; she can do no frequent bending, crouching or climbing, and she cannot engage in frequent overhead reaching; she cannot be exposed to concentrated amounts of respiratory irritants such as dusts, fumes, odors, gases or any changes in temperature and humidity; she is restricted to unskilled work; she must work in an environment where interpersonal contact is incidental to the work performed, the complexity of tasks is learned and performed by rote, requires little independent judgment and the supervision required is simple, direct, and concrete. (T. 14-18) Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence of record. (Doc. 9, pp. 16-19) Specifically, Plaintiff asserts that the ALJ failed to include in his RFC all of Plaintiff's alleged limitations set forth in Dr. Birk's medical source statement of July 16, 2012 (T. 434-437), and that the ALJ did not adequately discuss what weight he gave to Dr. Birk's medical source statement. (Doc. 9, pp. 16-17) The undersigned disagrees.

It is well settled that the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000). RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 416.945(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and

-18-

others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliam v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 416.945(a)(3). The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

"Light work" involves lifting no more than 20 pounds at a time with frequent lifting or carrying objects up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. §§ 404.1567(b), 416.967(b); SSR 83-10, 1983 WL 31251, at p. 5. "Unskilled work" is defined as work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. 20 C.F.R. §§ 404.1568(a), 416.968(a); SSR 83-10, 1983 WL 31251, at p. 7. The basic mental demands of unskilled work include the ability to understand, carry out, and remember simple instructions; respond appropriately to supervisors, co-workers, and usual work situations; and, deal with changes in a routine work setting. SSR 85-15, 1985 WL 56857, at p. 4.

The medical evidence of record is discussed above and will not be restated in depth again here. It establishes that while Plaintiff has some physical impairment during the relevant period due to problems with her neck and shoulders, that impairment has been treated conservatively with physical therapy and medication. On February 14, 2011, just prior to the relevant period, x-rays

-19-

showed some degenerative changes in Plaintiff's cervical spine at C5-6. (T. 321) Dr. Birk opined

that Plaintiff's on-going shoulder pain was actually "coming from her neck," and he recommended

cervical physical therapy. (T. 321) As of March 28, 2011, Plaintiff had not done any of the

recommended physical therapy[5]. Despite Dr. Birk being "pretty sure" that Plaintiff has a bulge or

herniation in her neck (T. 319), this was never confirmed with further imaging because the Plaintiff

never followed through with the recommended MRI. As of June 13, 2011, Plaintiff was only "mildly

tender" in the paraspinal muscles of her neck. (T. 318) On September 19, 2011, and in contrast to

Plaintiff's report that her cervical pain was 10 out of 10, Dr. Birk documented that Plaintiff's

cervical range of motion was normal and, while tender, there were no spasms. (T. 315-316) On

December 15, 2011, Dr. Birk again documented only some tenderness in Plaintiff's neck, with no

spasms, no neurological changes, and some mild tenderness in her shoulders, but no weakness. (T.

349) Similar findings were made by Dr. Birk on March 15, 2012. (T. 394) There are no further

treatment records from Dr. Birk after March 15, 2012, but four months later on July 16, 2012 he

issued a medical source statement (T. 434-437) that, among other things, opined that Plaintiff would

need a sit/stand/walk option at will if employed, that Plaintiff will sometimes need to take

unscheduled breaks, will need to lie down at unpredictable times to rest, and that on average she is

likely to miss work about two days a month as a result of her impairments. (T. 436) Just above these

opined limitations, however, Dr. Birk indicates that Plaintiff's pain is only "slight." (T. 436)

Moreover, the medical evidence of record fails to document any prior complaints of the Plaintiff

regarding an inability to sit, stand, and walk, or the need to take unscheduled breaks or lie down to

---

[5] An ALJ may properly consider the claimant's noncompliance with a treating physician's
directions. *See Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001).

rest. Considering the evidence as a whole, the ALJ found that Dr. Birk's opinion was entitled to some weight because it was generally consistent with the medical evidence, but that some of his opinions, such as the option to sit/stand/walk at will, were not supported by the medical evidence. An ALJ can give less weight to a treating physician's opinion when it is not sufficiently supported by medically acceptable clinical and diagnostic data. *Halverson v. Astrue*, 600 F.3d at 929-30; *Wildman v. Astrue*, 596 F.3d at 964; and, *Reed v. Barnhart*, 399 F.3d at 921. The undersigned finds substantial evidence of record to support the ALJ's decision to not to give controlling weight to all of Dr. Birk's opinions.

Plaintiff also argues, in conclusory fashion, that the ALJ failed to incorporate the mental findings of the consulting psychologist into his RFC determination. The consultative psychologist, Dr. Nelson, diagnosed Plaintiff with "mild depression" that did not significantly affect her activities of daily living, her ability to communicate and interact in a socially acceptable manner, or her capacity to communicate in an intelligible and effective manner. (T. 341) The limitations opined by Dr. Nelson, i.e., an inability to cope with work-like tasks, to sustain concentration, to sustain persistence, and to complete tasks, do not stem from any mental impairment, but from his view of Plaintiff's reported physical conditions. (T. 341) In discounting Dr. Nelson's opinions, the ALJ properly noted that Plaintiff had not sought or received any psychiatric treatment or medication for her depression during the relevant period. (T. 16, 55, 339) *See Banks v. Massanari*, 258 F.3d 820, 825-26 (8th Cir. 2001)(ALJ properly discounted claimant's complaints of disabling depression as inconsistent with daily activities and failure to seek additional psychiatric treatment).

Other mental evaluations, performed by non-examining state agency consultants, reflect that Plaintiff was able to perform unskilled work where interpersonal contact was incidental to the work

performed, complexity of tasks was learned and performed by rote with few variables and little judgment, and where supervision required was simple, direct and concrete. (T. 398-415, 420) State agency physicians are experts in disability evaluation, and an ALJ must consider their opinions. 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i). Here, there is no conflicting opinion from a treating physician because Plaintiff had not been treated for her mild depression, and the ALJ properly considered the expert opinions of the state agency consultants in determining Plaintiff's mental RFC limitations.

Further belying any claim for additional RFC limitations associated with mental health is Plaintiff's testimony that while she had "all kinds of anxiety issues" working at Walmart (T. 33), since leaving Walmart, "my whole outlook on life has just improved so much." (T. 55)

The evidence of record, taken as a whole, simply does not support any more physical or mental limitations than those set forth in the ALJ's determination of Plaintiff's RFC. Plaintiff was working as a supervisor, with no lifting requirements, just before her alleged date of onset. Her departure from that job had nothing to do with her physical or mental impairments, but instead, a failed drug test. Subsequently, Plaintiff's treatment has been conservative management of her shoulder and neck pain, and no treatment at all for any mental impairment. Based on all of the evidence contained in the file, the undersigned finds substantial evidence supporting the ALJ's RFC determination.

## IV.  Conclusion

Having carefully reviewed the entire record, the undersigned finds substantial evidence supporting the ALJ's Decision denying Plaintiff DIB and SSI benefits. It is recommended that the ALJ's Decision be  affirmed and Plaintiff's Complaint be dismissed with prejudice.

The parties have fourteen (14) days from receipt of this Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.

DATED this 29th day of May, 2015.

/s/ *Mark E. Ford*

HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE